**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INTERACTIVE GAMES LLC, <br><br> Plaintiff, <br><br> v. <br><br> FANDUEL, INC. and BETFAIR INTERACTIVE US, LLC, <br><br> Defendants. | Case No. <br><br> **DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Interactive Games LLC files this complaint for patent infringement against

defendants FanDuel, Inc. and Betfair Interactive US, LLC (collectively, FanDuel), and alleges as

follows:

1.      Interactive Games brings this action to protect its novel innovations related to

mobile gambling, sports betting, and fantasy sports betting from FanDuel's infringement.

Interactive Games' predecessor, Cantor Gaming, was the first to develop systems that allowed

users to gamble, place sports wagers, and play casino games on mobile devices. In the mid-

2000s, Cantor Gaming pioneered systems that allowed users to gamble on newly emerging

smartphones of the time, such as iOS and Android smartphones and tablets.[1] But, to allow secure

gambling on open devices over which it had no control, Cantor Gaming had to solve numerous

technological problems. Among other things, Cantor Gaming had to confirm the identity and

location of users, confirm that they were in (and did not leave) a jurisdiction where gambling

---

[1] This complaint discusses mobile applications running on "smartphones." In addition to iOS and Android smartphones, the term "smartphone" is intended to also refer to iOS and Android tablets and other mobile devices. All allegations apply equally to such devices.

1

was permitted, and ensure that their smartphones were not "rooted" (*i.e.*, hacked to obtain administrative privileges) or otherwise tampered with. Cantor Gaming protected the research, development, and innovations of its employees with patents as it expanded its mobile-gaming business. *See, e.g.*, Exhibits 1–5.

2.      FanDuel, founded in 2009, is a digital sports entertainment and gaming company offering online sports betting, daily fantasy sports, and online casino games. Its services are implemented through certain mobile applications publicly available on the Apple App Store and the Google Play Store. The infringing mobile applications include at least the iOS and Android versions of FanDuel Sportsbook & Casino, FanDuel Casino, FanDuel Fantasy Sports, FanDuel Racing, and FanDuel Picks (collectively, FanDuel's Mobile Apps).



FanDuel's Mobile Apps can also be accessed online through https://www.fanduel.com,[2] including its sub-domains.

3.      On information and belief, based on publicly available websites, regulatory filings, public descriptions, and an analysis of FanDuel's Mobile Apps, FanDuel has willfully infringed Interactive Games' intellectual property. Specifically, as described in nearly 275 pages of claim charts (*see* Exhibits 6–10), FanDuel has been developing, distributing, and profiting from FanDuel's Mobile Apps that infringe Interactive Games' patents without a license.

---

[2] *See* Exhibit 11.

**NATURE OF THIS ACTION**

4.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100 *et seq.* Interactive Games alleges that FanDuel infringes U.S. Patent Nos. 12,420,181, 12,397,226, 8,974,302, 12,434,138, and 12,400,515 (collectively, the Asserted Patents, and the '181, '226, '302, '138, and '515 patents, respectively).

**PARTIES**

5.      Interactive Games is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business at 110 East 59th Street, New York, New York, 10022. Interactive Games is a successor of Cantor Gaming.

6.      On information and belief, FanDuel, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Racetrack Drive, East Rutherford, New Jersey, 07073. FanDuel, Inc. provides licensing and operation services for daily fantasy sports services.

7.      On information and belief, Betfair Interactive US, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 525 Washington Boulevard, Jersey City, New Jersey, 07310. Betfair provides licensing and operation services for sports betting and online gaming.

8.      Both defendants operate under the name "FanDuel" to provide FanDuel's Mobile Apps and related services. For example, in the state of New Jersey, both FanDuel, Inc. and Betfair have been referred to as doing business as "FanDuel."[3]

---

[3] *See* https://www.nj.gov/oag/ge/docs/Rulings/2024/feb1_15/B6fanduel.pdf (Exhibit 12);
https://www.nj.gov/oag/ge/docs/Rulings/2022/may16_31/b4_ballys.pdf (Exhibit 13).

**JURISDICTION AND VENUE**

9.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.      This Court has personal jurisdiction over FanDuel, Inc. because it is at home in this District through the operation of its principal place of business in this District.

11.      This Court has personal jurisdiction over Betfair because it is also at home in this District through the operation of its principal place of business in this District.

12.      Additionally, this Court has personal jurisdiction over FanDuel, Inc. at least because FanDuel, Inc. has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; regularly conducts or solicits business in this District; derives substantial revenue by offering infringing products and services in this District; and has purposefully established substantial, systematic, and continuous contacts with this District. FanDuel should have reasonably expected to be subject to suit here by offering infringing products and services in this District. Moreover, FanDuel, Inc. has registered for and received a license for its online gaming platforms from the New Jersey Division of Gaming Enforcement.[4]

13.      Additionally, this Court has personal jurisdiction over Betfair at least because Betfair has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; regularly conducts or solicits business in this District; derives substantial revenue by offering infringing products and services in this District; and has purposefully established substantial, systematic, and continuous contacts with this District.

---

[4] *See* https://www.njoag.gov/about/divisions-and-offices/division-of-gaming-enforcement-home/sports-wagering/ (Exhibit 14).

4

Betfair should have reasonably expected to be subject to suit here by offering infringing products and services in this District. Moreover, Betfair has registered for and received a license for its online gaming platforms from the New Jersey Division of Gaming Enforcement.[5]

14.     On information and belief, FanDuel, Inc. has operated and continues to operate an interactive website and mobile applications that are accessible to all residents of New Jersey, through which FanDuel advertises and makes available FanDuel's Mobile Apps and associated services that infringe the Asserted Patents.[6]

15.     On information and belief, Betfair has operated and continues to operate an interactive website and mobile applications that are accessible to all residents of New Jersey, through which FanDuel advertises and makes available FanDuel's Mobile Apps and associated services that infringe the Asserted Patents.[7]

16.     Moreover, FanDuel's primary website includes a link that specifically refers users to place sports wagers in New Jersey.[8]

17.     Both FanDuel, Inc. and Betfair are subject to New Jersey rules and regulations through their operation of gaming within the state. *See, e.g.*, NJ Rev. Stat. § 5:12A-11 (2024) ("The division shall issue all sports wagering licenses and renewals thereof to casinos.").

18.     FanDuel, Inc. actively advertises, solicits business, and obtains revenues from its operation in New Jersey.

19.     Betfair actively advertises, solicits business, and obtains revenues from its operation in New Jersey.

---

[5] *See* https://www.nj.gov/oag/ge/docs/Rulings/2025/mar16_31/C7nyxdigital.pdf (Exhibit 15).

[6] *See, e.g.*, https://www.fanduel.com (Exhibit 11).

[7] *See id.*

[8] *See id.*

20.     FanDuel, Inc. purposefully avails itself of the benefit of conducting business in New Jersey by marketing and selling its products and services to citizens in the state. FanDuel, Inc. has purposefully and voluntarily placed its infringing products and services into this District and into the stream of commerce with the intention and expectation that the infringing products and services will be purchased and used in this District. This litigation arises from FanDuel, Inc.'s contacts with this District.

21.     Betfair purposefully avails itself of the benefit of conducting business in New Jersey by marketing and selling its products and services to citizens in the state. Betfair has purposefully and voluntarily placed its infringing products and services into this District and into the stream of commerce with the intention and expectation that the infringing products and services will be purchased and used in this District. This litigation arises from Betfair's contacts with this District.

22.     Further, on information and belief, FanDuel's Mobile Apps are all developed, at least in part, in this District by a team of engineers located at FanDuel's New Jersey headquarters. Also, on information and belief, FanDuel's Mobile Apps are distributed and offered for sale from this District.

23.     Venue is proper in this District as to FanDuel, Inc. under at least 28 U.S.C. §§ 1391(b) and (c), and 1400(b), at least because FanDuel, Inc. has a regular and established place of business in this District and has committed acts of infringement in this District.[9]

---

[9] *See* https://support.fanduel.com/s/article/FanDuel-in-New-Jersey (Exhibit 16).

24. Venue is proper in this District as to Betfair under at least 28 U.S.C. §§ 1391(b) and (c), and 1400(b), at least because Betfair has a regular and established place of business in this District and has committed acts of infringement in this District.[10]

25. FanDuel, Inc. and Betfair are properly joined under 35 U.S.C. § 299(a) because, as set forth in greater detail herein, Interactive Games' right to relief is asserted against them jointly, severally, and in the alternative with respect to or arising out of the same transactions, occurrences, and series of transactions and occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same infringing products and services, and questions of fact common to both defendants will arise in this action. FanDuel, Inc. and Betfair, through their own acts and the acts of each other as representative, alter ego, or agent of the other, commonly and jointly make, use, sell, offer to sell, and import the same infringing products and services discussed herein.

## INTERACTIVE GAMES' HISTORY OF INNOVATION

### A. The Problem of Online Gambling in the Era of Mobile Devices

26. In the early to mid-2000s, mobile devices like phones and tablets were getting smarter and more sophisticated. The iPhone launched in 2007, and Android devices launched a year later. Cantor Gaming recognized that smartphones, untethered from the floor of a casino or other brick-and-mortar gambling locations, would provide an entirely new way for people to play traditional casino games, such as blackjack and other table games, and to bet on sporting events. The idea to develop a system that allowed users to gamble and wager on mobile devices was the brainchild of Cantor Gaming inventors, who faced enormous problems unique to smartphones. Such devices (1) could be removed from the casino, which created challenges for verifying the

---

[10] *See id.*

identity and location of users, and (2) were always in the control of users, who could tamper with their devices. Smartphones thus created technical problems in terms of security, access, location confirmation, and fraud detection.

27.     At that time, the inventors faced a confusing and complicated patchwork of federal and state-specific gambling and betting regulations. Within the United States, each state had its own gambling commission and regulations, making it exceedingly difficult to create a mobile-gambling platform that could meet the needs of each state. Most states, at a minimum, limited the location where a user could gamble or place wagers, and these requirements changed over time.[11]

28.     Before Cantor Gaming began developing its mobile-wagering systems, gambling games were only legal onsite at casinos or other authorized locations in certain states, where the identity and location of users could be confirmed via in-person verification. As an example, if a person wishing to gamble walked into a casino, the casino could simply ask for identification, confirm that the person met certain requirements (*e.g.*, is over 21 years of age), and, through physical surveillance, confirm the user was not circumventing applicable gambling and betting regulations. While Nevada allowed users to play casino games on a desktop computer, users still had to confirm their identities in person and then be provided with a username and password. *See* '302 patent 37:10–17, 37:45–61.

29.     Sports wagering—legal solely in Nevada until 2018—faced similar restrictions. It required either in-person wagering at sportsbooks or establishing a remote sports-wagering

---

[11] *See, e.g.*, Government Accountability Office (GAO), Internet Gambling: An Overview of the Issues, GAO-03-89 at 1 (Dec. 2002), located at: https://www.gao.gov/assets/gao-03-89.pdf (Exhibit 17) ("The global legal framework for Internet gambling is a complicated mix of laws and regulations.").

account through an in-person signup procedure.[12] In the case of remote wagering, after an in-person account had been set up, the bettor's location was verified by low-powered pagers that were physically limited to operate only in legal betting areas and required to be on the bettor's person at all times. Further, voice inquiries about the bettor's account were used to confirm the bettor's identity. If the bettor was using a dial-up system, location was confirmed using the local area telephone switch to which the dial-up modem was connected. For cable internet connections, a bettor's location was verified by the location of the cable modem. These methods either required the use of stationary modems or secondary devices and technologies for compliance with state and federal laws.

30.    Cantor Gaming had to develop methods to keep mobile applications intended for smartphones secure and compliant with state and federal regulations. A smartphone user could be hundreds of miles away from the casino, thus making any in-person identification and oversight impractical. Cantor Gaming needed to find a technological solution for: verifying the identity of a user on a mobile device, confirming that the user was in (and stayed within) a location where gambling was allowed (and had not spoofed their location), confirming that the user had not implemented any software on the mobile device that would allow them to circumvent gambling and betting regulations, and detecting fraud. *See* '181 patent 23:13–64, 24:63–25:42; '226 patent 7:18–9:28, 14:7–23; '302 patent 38:33–39:17, 40:17–63; '138 patent 23:13–59, 24:64–25:43; '515 patent 15:35–16:9. These types of problems simply did not exist in brick-and-mortar casinos since a person could only gamble while physically present on the premises.

---

[12] *See* https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html at 2 (Exhibit 18).

31.     These problems presented not just a regulatory issue, but a technological one. Specifically, there was no existing technology that allowed for mobile gambling. Before 2006, the most popular Internet-enabled mobile device was the Blackberry, which did not have the necessary hardware or software to implement online gambling. *See* '226 patent 1:45–52. The Blackberry was also a closed system that did not allow third parties to develop mobile applications at the time.[13] The opportunity for third parties to develop applications was not prevalent until long after the Apple App Store had dominated the market,[14] and Apple did not release the iPhone or the App Store until 2007 and 2008, respectively.[15] The first Android phone was not released until October 2008.[16]

32.     Further, as discussed above, there were no technological solutions to reliably track the location of a user with a smartphone. The technology available at the time, which involved stationary equipment or secondary devices, did not allow for such tracking to be implemented.[17] Cellular towers, GPS, or WiFi alone could not reliably pinpoint the location of

---

[13] *See* https://d3.harvard.edu/platform-digit/submission/the-rise-and-fall-and-rise-again-of-blackberry/ at 3 (Exhibit 19).

[14] *See* https://www.makeuseof.com/the-reasons-blackberry-failed-spectacularlyand-why-they-might-rise-again/ at 4–5 (Exhibit 20).

[15] *See* https://www.fastcompany.com/90903224/15-years-ago-apple-launched-the-app-store-last-year-it-brought-in-1-1-trillion-for-developers/ (Exhibit 21).

[16] *See* https://www.cnet.com/tech/mobile/a-brief-history-of-android-phones/ (Exhibit 22).

[17] *See* Statement of Jeff Schmidt, in U.S. House of Representatives, Committee on Financial Services, Can Internet Gambling Be Effectively Regulated to Protect Consumers and the Payments System? 110th Cong., 1st Session, June 8, 2007, at 18–19, located at: https://www.govinfo.gov/content/pkg/CHRG-110hhrg37553/pdf/CHRG-110hhrg37553.pdf (Exhibit 23) ("These technologies are not reliable in their current form today. Technologies that attempt to identify a person's age as well as identify their geographic location will fail on the order of 20 percent."); *see also* Paul A. Zandbergen, Accuracy of iPhone Locations: A Comparison of Assisted GPS, WiFi, and Cellular Positioning, *Transactions in GIS*, 13:5–26 (June 26, 2009), located at: https://www.globe.gov/documents/2631933/6965868/42534991.pdf (Exhibit 24).

users to the extent necessary to meet state-specific regulations. *See* '181 patent 37:62–38:5, 52:42–53:40, 53:65–54:7; '226 patent 7:18–55, 8:3–26; '302 patent 52:65–53:3, 62:12–63:8, 63:36–40 (discussing reliability associated with proximate access points and signal strengths); '138 patent 37:66–38:9, 52:18–53:16, 53:41–50; '515 patent 19:48–20:18, 20:32–55. In fact, the inventors looked for third-party technology that could pinpoint a user's location with the requisite precision, but they were unable to find anything that could do so. *See* '181 patent 37:62–38:5, 52:42–53:40, 53:65–54:7; '226 patent 7:18–55, 8:3–26; '302 patent 52:65–53:3, 62:12–63:8, 63:36–40; '138 patent 37:66–38:9, 52:18–53:16, 53:41–50; '515 patent 19:48–20:18, 20:32–55.

**B.      Interactive Games' Technological Solutions**

33.      Cantor Gaming developed novel, technological solutions to these technological problems. *See* '181 patent 37:62–38:5, 52:42–53:40, 53:65–54:7; '226 patent 7:18–55, 8:3–26; '302 patent 52:65–53:3, 62:12–63:8, 63:36–40; '138 patent 37:66–38:9, 52:18–53:16, 53:41–50; '515 patent 19:48–20:18, 20:32–55. No other company was innovating in this area, and many thought the technological hurdles were insurmountable. Yet the Cantor Gaming inventors, including Howard Lutnick, Lee Amaitis, and Dean Alderucci, persisted, creating novel inventions that both proved mobile gaming was feasible and paved the way for regulatory and state-law changes. *See* '181 patent 24:63–25:30; '226 patent 14:24–39 ("The invention provides a high-speed, reliable, accurate, and secure mobile gaming environment that complies with regulatory requirements for identification and location verification of the bettor."); '302 patent 40:17–20 (inventing "a multisystem secure authentication protocol that may facilitate compliance with one or more regulatory requirements"); '138 patent 24:64–25:30. Cantor Gaming innovated and iterated over several years to implement novel technological solutions, and protected its innovations through patents.

11

34.     In 2011, Cantor Gaming released its Android sports betting application, which implemented some of its inventions related to mobile gaming. Cantor Gaming's application worked solely in the State of Nevada and prevented customers from placing wagers from outside the state. At the time, Cantor Gaming's CEO noted that the company's "primary goal and focus is to constantly enhance [its] customers' experience through innovative, superior technology," and that its "team ha[d] developed an application that is real-time, convenient and enjoyable."[18] That technology, he explained, "incorporat[ed] the most advanced and reliable security" known at that time.[19]

35.     The technology solved many technological problems, including those described below.

### 1.     Detecting Rooted Smartphones Among Different Devices

36.     The inventors faced the challenge of finding a reliable and foolproof method of verifying the user of a smartphone and confirming that the user had not hacked or otherwise secured unauthorized access to the device. *See* '181 patent 23:13–23, 23:45–52, Fig. 3; '302 patent 38:33–34, 38:64–39:1 ("verifying a mobile device for use with a gaming service" by "determin[ing] that the device has not been rooted"), Fig. 3; '138 patent 23:13–23; 23:45–64, Fig. 3. This was an important challenge because, if a user could hack their device (also known as "rooting" or "jailbreaking"), they could potentially spoof their location and thus gamble in jurisdictions that prohibit such activity or place wagers on behalf of unsuspecting customers.

37.     When a person uses a mobile device to place wagers, they have full control of the device and can freely make modifications to it. But, in order to comply with gambling and

---

[18] *See* https://www.prnewswire.com/news-releases/cantor-gaming-launches-android-compatible-mobile-sports-wagering-application-132609713.html at 1 (Exhibit 25).

[19] *See id.*

betting regulations, a gaming operator needs to ensure that users are in a jurisdiction where gambling is legal (and remain there for the duration of their gambling or betting). Because a user can modify their smartphone, they can modify it in a manner that spoofs or fakes the location of the device.[20] *See* '181 patent 23:13–23, 23:45–52, Fig. 3; '302 patent 38:33–34, 38:64–39:1 ("verifying a mobile device for use with a gaming service" by "determin[ing] that the device has not been rooted"); '138 patent 23:13–23; 23:45–64, Fig. 3. Put differently, the user could make the device appear to be in a location where gambling is allowed, when in fact the device is located in a jurisdiction where gambling is not permitted. And indeed, almost as quickly as smartphones were launched, software was created that would allow users to fake their location, including by faking GPS locations or obscuring the smartphone's IP address (*e.g.*, through the use of virtual private networks).[21] Thus, mobile-gambling systems needed to take into account ways users may be able to trick mobile applications into violating state-specific regulations. A gambling operator needed to detect when a user was spoofing a location and prevent such a user from gambling. *See* '181 patent 23:13–23, 23:45–52, Fig. 3; '302 patent 38:33–34, 38:64–39:1, Fig. 3; '138 patent 23:13–23; 23:45–64, Fig. 3.

38.    These issues were specific to gambling on smartphones. As discussed above, prior to mobile gaming, user verification was done in person. A person could confirm their eligibility to gamble in person if required and then be monitored by casino or sportsbook staff. Even when casinos offered onsite mobile devices, the devices were owned and maintained by the casino with superior surveillance capabilities and proprietary security. As such, casinos did not need to worry about a device being hacked, modified, or rooted.

---

[20] *See* https://us.norton.com/blog/emerging-threats/gps-spoofing (Exhibit 26).

[21] *See id.*

39.     The inventors also realized that the mobile applications would need solutions to combat the types of fraud unique to smartphones. For example, a user could develop something called a "betting bot," which is a script that is written and developed to perform pre-defined actions on a mobile-betting platform without any human interaction.[22] Betting bots also posed significant problems for gambling operators since they can skew odds by, for example, placing bets on every possible outcome across multiple bookmakers.

40.     To address these concerns, the inventors developed a system that could detect whether a device has bypassed security restrictions and other restrictions on the smartphone (*i.e.*, whether the device was rooted or jailbroken). *See* '181 patent 23:13–23, 23:45–52, Fig. 3; '302 patent 38:33–34, 38:64–39:1 ("verifying a mobile device for use with a gaming service" by "determin[ing] that the device has not been rooted"), Fig. 3 ("[c]heck if phone is rooted"); '138 patent 23:13–23; 23:45–64, Fig. 3. Rather than checking whether the user's device location is spoofed, the inventors devised a system that confirms the device has not been modified in the first place. *See* '302 patent 38:33–39:17. The system does this by confirming, through a number of different methods, that the user is in a location where gambling is permitted, and then looking for unapproved processes, applications, or operating systems being run or installed on the device. *See* '181 patent 23:13–64, Fig. 3; '302 patent 38:33–39:17, Fig. 3; '138 patent 23:13–59, Fig. 3. If the system finds an unapproved process, application, or operating system, the system automatically prevents the user from gambling and placing bets. *See* '181 patent 36:36–45; '302 patent 51:37–46; '138 patent 36:36–45.

41.     These systems worked across different hardware and devices because the inventors also developed a novel "wrapper" that allowed common software to run on different

---

[22] *See* https://www.nytimes.com/2011/03/14/science/14poker.html?_r=0 (Exhibit 27).

devices regardless of their specific hardware or operating system. *See* '181 patent 24:6–16, 25:44–26:47, 30:28–36, 36:46–37:8, 57:59–58:20; '302 patent 39:26–36, 40:64–41:65, 45:40–48, 51:47–64, 67:19–45; '138 patent 24:6–16, 25:44–26:47, 30:28–49, 36:46–37:9, 57:28–55. The wrapper allowed the gambling application to be written in a single programming language, like Java, while the wrapper itself was written in a programming language specifically compatible with each device. *See* '181 patent 24:6–16, 25:44–26:47, 30:28–36, 36:46–37:8, 57:59–58:20; '302 patent 39:26–36, 40:64–41:65, 45:40–48, 51:47–64, 67:19–45; '138 patent 24:6–16, 25:44–26:47, 30:28–49, 36:46–37:9, 57:28–55. This was critically important because, while today's U.S. market is largely dominated by Apple and Samsung, that was not true at the time of the inventions. At that time, the market was more fractured, and it was unclear which devices (or whether any then-existing devices) would become dominant in the marketplace. Consequently, a single version of the gambling application was needed that was compatible with all devices.

### 2.    Preventing Fraud

42.    The inventors also developed a solution to prevent fraud. As discussed above, due to the nature of mobile gambling, the inventors understood that, when users were not under the watchful eye of a casino or sportsbook employee, there was an increase in fraudulent bets. *See* '226 patent 16:22–46 (discussing the need for "increased surveillance of the user" when deviations from normal behavior occur). Further, users were able to place an increased volume of bets via mobile devices, which they would be prevented from doing in a physical casino. It was neither practical nor even possible for humans to monitor such betting practices to stop fraudulent betting. *See* '226 patent 16:22–46.

43.    To combat this problem, the inventors developed a system that determines whether a user's wager has the same characteristics of the user's prior wagers. *See* '226 patent

15

16:7–46. The system monitors and stores wager characteristics as the user enters wagers and transactions, thereby adding a layer of security for the device. *See* '226 patent 16:29–33. If the system determines that a wager deviates from prior wagers placed by the user, the system prevents the user from making additional wagers. *See* '226 patent 16:22–46.

### 3. Precision Location Determination

44. The inventors also confronted the problem of people using smartphones within a gambling jurisdiction but outside premises in which gambling is legal (like a casino). As an example, Nevada required all gambling and wagers made in the state to originate within state lines. *See* Nevada Gaming Control Board, Regulation 5A, Operation of Interactive Gaming (adopted Dec. 2011, revised May 2024), located at: https://gaming.nv.gov/uploadedFiles/gamingnvgov/content/Home/Features/Regulation5A.pdf. But, at various times, gambling was not permitted in every location within the state (*e.g.*, in hotel rooms). Nevada Gaming Control Board, Regulation 5, Operation of Gaming Establishments (effective Mar. 23, 2006), located at: https://gaming.nv.gov/uploadedFiles/gamingnvgov/content/divisions/administration/history/regulation-5-220-date-03-23-2006-7212.pdf (*see* Regulation 5.220(1)(i)). Thus, Cantor Gaming needed a technological solution that would allow a mobile-gambling platform to (1) accurately and reliably determine a user's location to confirm that the user was within the State of Nevada *and* not in a place that disallowed gambling, and then (2) verify the user's identity. If Cantor Gaming failed to follow these regulations, it would be subject to fines and penalties from the state.

45.     But, at that time, the process of determining the location of a user with a smartphone (*i.e.*, their geolocation) was not an easy task.[23] And, as explained above, all the means known for doing so were unreliable. Nor could the technology determine whether the user's mobile device subsequently moved outside the jurisdiction. Moreover, the inventors needed to tackle the prospect of a user traveling in a vehicle, and potentially heading out of state, or being near a border. *See* '181 patent 34:27–58, 38:47–57; '302 patent 49:31–61 (increasing the rate of location checks "near a border of a state"), 53:58–62; '138 patent 34:27–58, 38:55–65. In addition, certain locations had unreliable GPS and cellular signals, making it impossible to rely on those technologies alone for location tracking. Accordingly, the location determination also needed to take into account a user's speed vis-à-vis their location.

46.     Other technology required the use of a computer's IP address to detect location. *See* '515 patent 10:26–40. However, smartphones made capturing IP addresses unreliable because whether the IP address would change as a user traveled would depend on a number of factors, including whether the user was accessing certain WiFi networks or cellular towers. In addition, users could cause their devices to have "static" IP addresses so that the IP addresses would not change even as users change their location. A static IP address could indicate that a user is in a jurisdiction where gambling is permitted regardless of the user's actual location.

47.     GPS, a technology that was nascent for mobile devices at the time, was likewise unreliable. For example, while GPS is accessible nearly everywhere outside (with a clear view of the sky), it is generally inaccessible indoors and lacks precision—*e.g.*, it is challenging to

---

[23] *See, e.g.*, https://www.bettingusa.com/geolocation/ at 3 (Exhibit 28) ("When Delaware, Nevada, and New Jersey launched online gambling and poker in 2013, geolocation problems were more frequent than they are today.").

determine when a user approaches a state border.[24] Further, the user's location could quickly change (*e.g.*, when the user is in a vehicle), causing the GPS location to be accurate one moment and inaccurate the next. *See* '181 patent 34:27–58, 38:47–57; '302 patent 49:31–61, 53:58–62; '138 patent 34:27–58, 38:55–65. Thus, the use of GPS alone was not conducive to detecting the location of a user for mobile gambling. *See* '181 patent 40:45–49:37; '302 patent 60:19–43 (discussing potential errors in location determinations); '138 patent 40:52–51:15.

48.    WiFi was also unsuitable for detecting the location of a smartphone. Although WiFi location tracking was somewhat precise, it could not be reliably used when a person with a smartphone was traveling over long distances because there was no guarantee of WiFi coverage outside of urban areas. And verifying locations with cellular towers was imprecise because such towers likewise lacked coverage in certain areas. *See* '181 patent 37:62–38:5, 38:47–57, 52:42–53:40; '302 patent 52:65–53:3, 53:52–56 ("a location service may charge a fee"), 62:12–63:8 (relying on "signal strengths" for location determination); '138 patent 37:66–38:9, 38:55–65, 52:18–53:16. It was also expensive, as obtaining location data from cellular towers incurred a fee from the mobile phone companies. *See* '181 patent 38:47–57; '302 patent 53:52–56 ("a location service may charge a fee"); '138 patent 38:55–65.

49.    Further, verifying the location of smartphones was technically challenging for several reasons. For one, Cantor Gaming was required to ensure that mobile devices could operate at or near a border with significant precision, since one foot could be the difference between a user legally or illegally gambling. *See* '181 patent 34:27–58, 38:47–57; '302 patent 49:31–61, 53:58–62; '138 patent 38:55–65. But constantly running location checks using cellular

---

[24] http://spcomnav.uab.cat/docs/journals/Seco_Challenges_Indoor_GNSS_IEEE_SPMAG _2012.pdf (Exhibit 29).

towers was costly (as noted above) and also drained a smartphone's battery.[25] *See* '181 patent 38:47–57; '302 patent 53:52–56; '138 patent 38:55–65. Further, Cantor Gaming had to also account for a user modifying their smartphone to give false location responses or manipulate mobile-gaming applications. *See* '181 patent 23:13–64, Fig. 3; '302 patent 38:33–39:17, Fig. 3; '138 patent 23:13–59, Fig. 3.

50.     Cantor Gaming's inventors developed a system that could reliably detect a user's geographic location by repeatedly performing checks on the device's location. *See* '181 patent 25:31–42, 34:27–58, 38:47–57; '302 patent 40:51–63, 49:31–61, 53:58–62; '138 patent 25:31–43, 38:55–65. Under the system, the timing of the checks depends on the location of the device. *See* '181 patent 25:31–42, 34:27–58, 38:47–57; '302 patent 40:51–63, 49:31–61, 53:58–62; '138 patent 25:31–43, 38:55–65, 38:55–65. For example, if a user is located well within Nevada state lines, the location of the device will be checked less often. *See* '181 patent 25:31–42, 34:27–58, 38:47–57; '302 patent 40:51–63, 49:31–61, 53:58–62; '138 patent 25:31–43, 38:55–65, 38:55–65. However, the system allows more frequent location checks the closer a device gets to state lines so that the user's access to the gaming application can be turned off if they cross from a state where gambling is legal to a state where it is not. *See* '181 patent 25:31–42, 34:27–58, 38:47–57; '302 patent 40:51–63, 49:31–61, 53:58–62; '138 patent 25:31–43, 38:55–65, 38:55–65. This allows for the device's location to be accurately determined through usage of the mobile application. It further enables the mobile application to cease allowing a user to gamble or place wagers once the user and device are outside state lines in accordance with state-specific

---

[25] *See* https://arxiv.org/pdf/1303.5943 at 1 (Exhibit 30) (discussing, in 2013, phone battery drain due to GPS).

regulations. *See* '181 patent 36:36–45, 38:19–28; '302 patent 51:37–46, 53:23–32; '138 patent 36:36–45, 38:25–34.

### 4.    Game Recommendation

51.    Still further, the inventors faced the issue of advertising games to users on smartphones. *See* '515 patent 11:11–12:45. Prior to mobile devices, people gambled onsite in places where gambling and betting were permitted, thus allowing casinos to advertise games by placing brochures for such games in proximity to games having similar characteristics. With the advent of remote gambling, however, the inventors had to find a different way to recommend new games to users.

52.    The inventors identified a unique approach to this issue. The inventors developed a system that identifies a characteristic of a game that a user has played a few times, identifies a second game having similar characteristics as the first game, and provides a recommendation to the user to play the second game. *See* '515 patent 11:11–12:45.

53.    This invention solved the issue of effective game recommendation confronted by gambling operators, and also had the additional benefit of tailoring new game recommendations to users based on their preferences. *See* '515 patent 11:11–12:45.

### THE ASSERTED PATENTS

54.    The inventions discussed above are protected by a number of patents, including the Asserted Patents.

### A.    U.S. Patent No. 12,420,181

55.    On September 23, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,420,181, entitled "Smart Phone with Gambling Application That Checks for Unauthorized Applications and Processes." A true and correct copy of the '181 patent is attached hereto as **Exhibit 1**. The '181 patent is assigned to Interactive Games, and Interactive Games

possesses the exclusive right of recovery for any past, present, or future infringement of the '181 patent, including equitable relief and damages.

56.     The '181 patent claims priority to a number of patent applications with a priority date as early as August 13, 2010. The '181 patent is a continuation of U.S. Patent Application No. 18/198,572, filed May 17, 2023, which is a continuation of U.S. Patent Application No. 17/835,022, filed June 8, 2022, which is a continuation of U.S. Patent Application No. 16/900,494, filed June 12, 2020, which is a continuation of U.S. Patent Application No. 14/640,439, filed March 6, 2015, which is a continuation of U.S. Patent No. 8,974,302, filed April 5, 2011, and issued March 10, 2015, which is a continuation-in-part of U.S. Patent No. 8,956,231, filed March 24, 2011, and issued February 17, 2015. The '181 patent also claims priority to U.S. Provisional Application No. 61/373,435, filed August 13, 2010, U.S. Provisional Application No. 61/405,439, filed October 21, 2010, U.S. Provisional Application No. 61/405,309, filed October 21, 2010, U.S. Provisional Application No. 61/413,098, filed November 12, 2010, and U.S. Provisional Application No. 61/413,089, filed November 12, 2010.

57.     As explained above, the advent of mobile devices such as smartphones brought about technological challenges for ensuring that the users of such devices could lawfully gamble while also ensuring a unified experience regardless of the device they are using. The '181 patent addresses aspects of these challenges. Its claims are generally directed to location verification, root detection, cross-compatibility, and device authentication. Specifically, the '181 patent claims the ability of a system to determine whether a device is rooted by obtaining a list of applications that are installed on a user's smartphone and to determine whether the mobile device is authorized to use a gambling service based on the device's location and rooting checks.

21

Importantly, by leveraging a "wrapper," authorization can be ensured across numerous types of devices because the wrapper enables using a unified programming language across a range of devices regardless of their specific requirements. And, as explained above, this was critical because the market at the time of invention was more fractured and had many device types that needed to be supported.

58.    The '181 patent discloses "various procedures" that "may be used to ensure security, authenticity, and/or locations of a customer and/or device" such that, "when in [a] location where such gaming is allowed [and] when a device is properly authorized and/or controlled, a customer may operate a mobile device to place one or more wagers from a wagering or other account over [a] communication network." '181 patent 20:17–32. These procedures address technological challenges specific to the use of wirelessly connected mobile devices, "designed to provide a desired level of confidence that a mobile device is not being accessed remotely, a mobile device has not been hacked, and/or a mobile device is at a location where gaming is allowed." '181 patent 21:22–26. As explained above, this was critical because, if a user could root or jailbreak their device, they could potentially modify the device to make it appear as if it was in a different location (*e.g.*, a location where mobile gambling is legal) than where it actually was. The user could also leverage a rooted or jailbroken device to make it appear as if it is not rooted or jailbroken. Thus, the inventors needed to develop techniques that not only determined that a device was actually rooted or jailbroken, but also looked for fingerprints of a rooted or jailbroken device in case the user was intentionally trying to obfuscate that the device had been rooted or jailbroken.

59.    The '181 patent describes a number of ways to determine whether the mobile device has been rooted. One example includes "comparing a running operating system with a

listing of approved operating systems for the communication network and device." '181 patent

23:45–52. Another example includes determining that the device "is not running and/or storing

any undesired programs," such as malware and remote access technologies. '181 patent 23:54–

64. Moreover, the mobile-gaming system may conduct "a search of a memory, a comparison of

running and/or stored programs with a listing of approved and/or unapproved programs, and so

on." '181 patent 23:54–64. On the other hand, the system can also determine that "the device is

running an approved antivirus program," and therefore is not rooted. '181 patent 23:54–64.

60.    An example of a system using the process of root detection to determine whether

the mobile device is authorized to gamble or place wagers is shown in Figure 3, reproduced

below.



FIG. 3

See '181 patent Fig. 3. As the '181 patent describes, the verification process depicted in Figure 3

involves "requesting an initiation of [] location tracking of a mobile device, tracking a mobile

device, providing location information about a mobile device, determining if a customer has

tampered with a client and/or operating system, determining whether one or more

23

communication interfaces are enabled and/or active, and so on." '181 patent 36:54–61. By performing these specific checks, the system can verify that a user's mobile device has not been rooted or otherwise altered and is therefore permitted to engage in gambling.

61. These techniques were unconventional at the time of the '181 patent. Monitoring gambling activities at brick-and-mortar casinos did not present similar technological challenges. Mobile gambling was in its infancy at the time of the '181 patent, as discussed above, and gambling applications carried a risk of fraud that was of little concern in other forms of mobile gaming. The devices could also be trivially rooted or jailbroken to spoof location, and there was a wide range of devices that needed to be supported and thus verified. The unconventional verification techniques recited in the '181 patent claims address these concerns by ensuring that the user's device has not been rooted or otherwise altered in an unapproved manner and remains in a location where gambling is authorized, all while supporting numerous different device types via a "wrapper." For example, claim 1 recites "obtain[ing] a list of applications installed on the smart phone," "determin[ing] whether the geographic location of the smart phone is a location where gambling is allowed," "determin[ing] whether the smart phone is rooted based in part on the list of applications installed on the smart phone," and deciding that "a user of the smart phone is allowed to gamble" based on those determinations. '181 patent claim 1. Claim 1 further places the rooting determination with "the gambling service," separate from the mobile device, thus reducing the ability for users to manipulate such a determination. '181 patent claim 1.

62. The dependent claims additionally recite unconventional location-verification techniques to ensure that users remain in authorized gambling locations. *See, e.g.*, '181 patent claim 2 ("determining that the smart phone has crossed or is near crossing the border of the geofenced area in which gambling is allowed"); claim 3 (determining location based on "a set of

24

wireless access points in proximity of the smart phone" and "a signal strength between the wireless access point and the smart phone").

**B.     U.S. Patent No. 12,397,226**

63.     On August 26, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,397,226, entitled "User Verification for Gambling Application Based on Location and the User's Prior Wagers." A true and correct copy of the '226 patent is attached hereto as **Exhibit 2**. The '226 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '226 patent, including equitable relief and damages. On September 30, 2025, a certificate of correction issued for the '226 patent, which corrected non-substantive, typographical errors in the issued claims.

64.     The '226 patent claims priority to a number of patent applications with a priority date as early as May 5, 2006. The '226 patent is a continuation of U.S. Patent Application No. 18/219,866, filed July 10, 2023, which is a continuation of U.S. Patent No. 11,738,258, filed January 24, 2022, and issued August 29, 2023, which is a continuation of U.S. Patent No. 11,229,835, filed August 24, 2020, and issued January 25, 2022, which is a continuation of U.S. Patent No. 10,751,607, filed April 18, 2019, and issued August 25, 2020, which is a continuation of U.S. Patent No. 10,286,300, filed April 14, 2014, and issued May 14, 2019, which is a continuation of U.S. Patent No. 8,695,876, filed November 26, 2008, and issued April 15, 2014, which is a continuation of U.S. Patent No. 7,549,576, filed May 5, 2006, and issued June 23, 2009.

65.     As explained above, the advent of mobile devices such as smartphones brought about technological challenges for ensuring that the users of such devices could lawfully gamble. The '226 patent addresses these challenges. Its claims are generally directed to a system for detecting fraud by determining a wager characteristic of the user and thereafter detecting

deviations in the user's wagers. The system not only ensures that bets are not fraudulent but also implements a robust "identity verification" to ensure that the bettor is, in fact, who they purport to be. *See* '226 patent 14:7–23.

66.     Figure 3 of the '226 patent, reproduced below, is a "diagram of a convenience gaming system illustrating various gaming activities." '226 patent 2:28–31.



*See* '226 patent Fig. 3. The figure illustrates a user "gaming communication device 32 [] in communication with a gaming service provider 36 over a network 34." '226 patent 6:5–7. The system allows a user to interact with "gaming applications" to place wagers on, *e.g.*, "horse racing and other sports." '226 patent 6:9–13.

67.     The '226 patent explains that, when a user is connected to the gaming service, the device may communicate wager "characteristics associated with the authorized user." '226 patent 16:22–24. A wager characteristic can include "the average volume wagered by the user, whether the user is a high-volume, medium-volume or low-volume wagerer, the user's wagering performance, [and] whether the user is a member of a club affiliated with the organization that distributed the apparatus to the user." '226 patent 16:22–46. The specification also notes that the

26

"characteristics may be stored and updated on an apparatus [] and/or device [] as the user enters into more wagers and transactions." '226 patent 16:22–46.

68.     The '226 patent further discloses that, even if the user and the mobile device have passed through security features, the user may be denied access and the wager denied "if the updated information does not fall within a predetermined range of acceptable characteristics or does not substantially match ongoing wagering requirements within a predetermined degree of tolerance." '226 patent 16:22–46. This additional "layer of security for the device," '226 patent 16:29–33, was completely unconventional compared to prior techniques at the time of the '226 patent. Identity verification at brick-and-mortar casinos did not present similar technological challenges. Mobile gambling was in its infancy at the time of the '226 patent, as discussed above, and mobile-gaming applications carried a risk of fraud that was of little concern in other forms of mobile gaming—*e.g.*, that the bettor was someone different than the authorized user of the device. In addition, because the bettor did not need to be physically present at a sportsbook, the bettor could improperly use information that otherwise would not have been accessible to the bettor while located physically in a sportsbook.

69.     The '226 patent claims solve these identity-verification issues in an unconventional manner by evaluating wagering characteristics of users to determine fraudulent wagering in real time. For example, claim 1 recites "receiv[ing] via the mobile phone, input from the user that specifies the wager for [a] gambling event," determining "that the wager deviates from a wagering characteristic of the user that is based on prior wagers submitted by the user" within tolerances or predetermined characteristics and, in response, "prevent[ing], by the application, the user from submitting further wagers via the mobile phone." '226 patent claim 1. And these identity-verification checks are used in conjunction with determining "that the mobile

27

phone is in a defined geographical area in which gambling is permitted" in order to ensure the wagering activities comply with relevant regulations. '226 patent claim 1.

### C.    U.S. Patent No. 8,974,302

70.    On March 10, 2015, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 8,974,302, entitled "Multi-Process Communication Regarding Gaming Information." A true and correct copy of the '302 patent is attached hereto as **Exhibit 3**. The '302 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '302 patent, including equitable relief and damages. On April 12, 2024, a reexamination certificate issued amending claim 15 and adding claims 26–40.

71.    The '302 patent claims priority to a number of patent applications with a priority date as early as August 13, 2010. The '302 patent is a continuation-in-part of U.S. Patent No. 8,956,231, filed March 24, 2011, and issued February 17, 2015. The '302 patent also claims priority to U.S. Provisional Application No. 61/373,435, filed August 13, 2010, U.S. Provisional Application No. 61/405,439, filed October 21, 2010, U.S. Provisional Application No. 61/405,309, filed October 21, 2010, U.S. Provisional Application No. 61/413,098, filed November 12, 2010, and U.S. Provisional Application No. 61/413,089, filed November 12, 2010.

72.    As explained above, the advent of smartphones brought about technological challenges for ensuring that users of such devices are located where they purport to be and stay there while gambling. The '302 patent addresses these challenges. Its claims are generally directed to complex techniques for repeatedly checking a user's location in time intervals that are determined by the user's location, as well as checking the authorization status of a user's device—*i.e.*, whether the device is jailbroken or otherwise compromised. To "help ensure that a customer is/was at an approved area (e.g., when a location check is performed, when a wager

28

request is received … , etc.)," the system may employ geofencing technology. '302 patent 52:20–24. These techniques address technological challenges specific to the use of wirelessly connected mobile devices and are "designed to provide a desired level of confidence that a mobile device is not being accessed remotely," "has not been hacked," and "is at a location where gaming is allowed." '302 patent 36:44–51. Moreover, there were technical limitations on how often a device's location could be checked due to battery life and cost concerns. These concerns were mitigated by the novel dynamic location checks disclosed in the '302 patent.

73.     The '302 patent discloses the use of information received from these checks to determine whether the device is allowed to place bets in accordance with state-specific regulations. For example, the claimed apparatus performs a verification procedure that determines the eligibility of a device to meet state-specific regulations and, therefore, be permitted to allow mobile gaming. *See* '302 patent 35:46–56. An example of this procedure is shown in Figure 3, reproduced below.



*See* '302 patent Fig. 3. As the '302 patent describes, the verification process depicted in Figure 3 involves "requesting an initiation of [] location tracking of a mobile device, tracking a mobile device, providing location information about a mobile device, determining if a customer has tampered with a client and/or operating system, determining whether one or more communication interfaces are enabled and/or active, and so on." '302 patent 51:55–62.

74.    The specification of the '302 patent notes that, "[i]n some embodiments, to implement a geofencing technology, a gaming operator may work with Sprint, another geofencing provider, and/or a third party provider to ensure that desired locations are geofenced (e.g., the city of Las Vegas, Reno, Tahoe and/or other gaming locations within the state of Nevada and/or elsewhere)." '302 patent 36:29–35. The specification provides a further example, noting that "[s]uch a process may include use of a Soft tag and/or other location determination to locate the device." '302 patent 41:15–17.

75.    The specification provides additional examples of location tracking options, including an "architecture that may be used in some embodiments for location determination," as illustrated in Figure 7 ('302 patent 61:40–41), reproduced below.



FIGURE 7

*See* '302 patent Fig. 7.

76.    As the '302 patent specification notes, "one or more mobile device[s] may communicate with a gateway. Such a gateway may communicate with a location-determination service. In some embodiments, the gateway may determine whether a location determination is desired (e.g., in response to a wager, periodically, in response to a variable becoming invalid, etc.)." '302 patent 53:33–41; 61:42–47.

77.    The '302 patent identifies a number of potential techniques for determining location, including soft tags, GPS, network identification, cellular towers, access points, and signal strengths. *See, e.g.,* '302 patent 62:60–63:8.

78.    The '302 patent goes a step further by checking whether the device itself is authorized and reliable. For example, the claims require the mobile application to ensure that the smartphone is not jailbroken or rooted such that the location may be spoofed. *See, e.g.,* '302 patent claim 1 ("determine whether a mobile device is authorized to use a gaming service"); claim 7 ("determine whether an operating system of the mobile device is authorized to use the

31

gaming service"). This can be done in a variety of ways, including by checking for any "jailbreak" applications, processes, or code located on the device. *See, e.g.*, '302 patent claim 34 ("access a list of applications installed on the mobile device" and "determine whether an application in the list of installed applications is disallowed from being installed"); claim 37 ("access a list of running processes on the mobile device" and "determine whether at least one of the running processes is disallowed").

79.     The '302 patent states that "verification may include, for example, determining an authenticity of software, determining an operating system version, determining a communication network, and/or any other actions as desired." '302 patent 38:34–42. Further, the '302 patent states that, "[i]n some embodiments, software on the gaming device may be executed to perform verification. In some embodiments, a third party and/or second machine may perform verification." '302 patent 38:45–48.

80.     The '302 patent's claimed techniques are unconventional as compared to prior approaches. Monitoring gambling activities at brick-and-mortar casinos did not present similar technological challenges. Mobile gambling was in its infancy at the time of the '302 patent, as discussed above, and gambling applications carried a risk of fraud that was of little concern in other forms of mobile gaming. The unconventional techniques recited in the '302 patent claims address these concerns by ensuring that the user's precise location is approved and repeatedly checked, all while efficiently managing the device's battery life and location-checking costs. For example, claim 1 recites a combination of a mobile device, a user, and location verification, and "repeatedly … determine[s] whether the mobile device is within or without a geographical area in which the user is allowed to engage in gaming activity on the mobile device." '302 patent claim 1. And the dependent claims recite unconventional location-determination techniques to

ensure the user remains in an authorized area. *See, e.g.*, '302 patent claim 6 ("determining whether the mobile device is located within or without the gaming-allowed geographical area by querying a geofencing service"); claim 10 (determining frequency of location checks based on "speed of travel of the mobile device and the distance to the boundary" of an authorized area).

81.     Indeed, the validity of the '302 patent has been extensively litigated and upheld. For example, the Patent Trial and Appeal Board denied a petition for *inter partes* review of the '302 patent. *See* IPR2020-01108, Paper 10 at 23 (holding that "the Petition does not demonstrate a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim of the '302 patent"). Further, in November 2022, the U.S. Patent Office conducted an *ex parte* reexamination of the '302 patent and, in April 2024, issued an *ex parte* reexamination certificate upholding all claims of the '302 patent (and adding new patentable claims).

**D.     U.S. Patent No. 12,434,138**

82.     On October 7, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,434,138, entitled "Gambling Service With Adaptive Location Checking Frequency." A true and correct copy of the '138 patent is attached hereto as **Exhibit 4**. The '138 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '138 patent, including equitable relief and damages.

83.     The '138 patent claims priority to a number of patent applications with a priority date as early as August 13, 2010. The '138 patent is a continuation of U.S. Patent Application No. 18/198,572, filed May 17, 2023, which is a continuation of U.S. Patent Application No. 17/835,022, filed June 8, 2022, which is a continuation of U.S. Patent Application No. 16/900,494, filed June 12, 2020, which is a continuation of U.S. Patent Application No. 14/640,439, filed March 6, 2015, which is a continuation of U.S. Patent No. 8,974,302, filed

April 5, 2011, and issued March 10, 2015, which is a continuation-in-part of U.S. Patent No. 8,956,231, filed March 24, 2011, and issued February 17, 2015. The '138 patent also claims priority to U.S. Provisional Application No. 61/373,435, filed August 13, 2010, U.S. Provisional Application No. 61/405,439, filed October 21, 2010, U.S. Provisional Application No. 61/405,309, filed October 21, 2010, and U.S. Provisional Application No. 61/413,089, filed November 12, 2010.

84. As explained above, the advent of mobile devices such as smartphones brought about technological challenges for ensuring that users of such devices are located where gambling is allowed and remain there while gambling. But these location checks degraded the battery life of devices and had costs associated with them. The '138 patent addresses these challenges. Its claims are generally directed to performing a series of checks to verify the location of a user's mobile device at different rates, thereby allowing the user to gamble and place wagers if they are within the allowed geographic area. These techniques address technological challenges specific to the use and movement of wirelessly connected mobile devices and sought to "provide a desired level of confidence that a mobile device … is at a location where gaming is allowed." '138 patent 21:21–29.

85. Figure 3 of the '138 patent, reproduced below, illustrates a device-verification procedure that includes location tracking.



*See* '138 patent Fig. 3. As the '138 patent describes, the verification process depicted in Figure 3 involves "requesting an initiation of [] location tracking of a mobile device, tracking a mobile device, providing location information about a mobile device, determining if a customer has tampered with a client and/or operating system, determining whether one or more communication interfaces are enabled and/or active, and so on." '138 patent 36:46–63.

86.    The '138 patent identifies a number of potential location-determination techniques, including soft tags, GPS, network identification, cellular towers, access points, and signal strengths. *See, e.g.,* '138 patent 52:18–53:16. The '138 patent describes a system that unconventionally determines the timing for location checks based on the user's location in comparison to the border of an authorized area. For example, the '138 patent explains that "location checks may be made more frequent when a mobile device is near an edge of an approved area than when the device is far from an edge of an approved area." '138 patent 34:27–58. The '138 patent further explains: "Some embodiments may include a variable frequency

and/or need for such queries and/or determinations. Some embodiments may include determining when to make a determination of a location based on a distance from [a] boundary (e.g., a boundary of a geofence, a boundary of an allowed gaming area) of a prior location determination." '138 patent 38:55–65.

87.     The '138 patent's claimed techniques are unconventional as compared to prior approaches. Location monitoring was not a concern for traditional brick-and-mortar casinos. Mobile gambling was in its infancy at the time of the '138 patent, as discussed above, and gambling applications carried a risk of fraud that was of little concern in other forms of mobile gaming. Thus, prior techniques of verifying a user's location once (*e.g.*, during an initial login) did nothing to combat movement of the user during gambling activities. And, too many location checks could degrade battery life or have other costs associated with them. The techniques recited in the '138 patent claims address these concerns by performing a series of "location checks" "during the period of time in which access to the gambling service is provided." '138 patent claim 1. And the "rate" at which location checks are performed is based on "a first distance from a border of a U.S. state where gambling is allowed." '138 patent claim 1. Thus, if a user is close to the border of a state, the location check would occur more frequently than for a user who is far from the border of a state. *See* '138 patent 34:27–58, 38:66–39:20, claim 1.

E.     **U.S. Patent No. 12,400,515**

88.     On August 26, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,400,515, entitled "Mobile Gambling Application With Location-Based Tracking and Recommendations Based on What Games Are Trending." A true and correct copy of the '515 patent is attached hereto as **Exhibit 5**. The '515 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '515 patent, including equitable relief and damages.

89.     The '515 patent claims priority to a number of patent applications with a priority date as early as October 9, 2007. The '515 patent is a continuation of U.S. Patent Application No. 18/243,139, filed September 7, 2023, which is a continuation of U.S. Patent No. 11,798,354, filed January 3, 2022, and issued October 24, 2023, which is a continuation of U.S. Patent No. 11,217,063, filed July 24, 2019, and issued January 4, 2022, which is a continuation of U.S. Patent No. 10,380,835, filed January 12, 2015, and issued August 13, 2019, which is a continuation U.S. Patent No. 8,932,131, filed October 9, 2007, and issued January 13, 2015.

90.     As explained above, the advent of smartphones brought about technological challenges for allowing users to gamble on those devices. The '515 patent addresses these challenges. Its claims are generally directed to a system that allows gambling operators to recommend new wagering games to smartphone users to ensure the users have ready access to games of interest that are available in their location.

91.     Figure 3 of the '515 patent, reproduced below, shows a "gaming service provider in communication with a gaming communication device according to some embodiments." '515 patent 1:29–31.



*FIG. 3*

*See* '515 patent Fig. 3. The figure illustrates a user "gaming communication device 32 [] in communication with a gaming service provider over a network 34." '515 patent 18:40–42. The

system allows a user to interact with "gaming applications" to place wagers on, *e.g.*, "horse racing and other sports." '515 patent 18:44–48.

92.    The '515 patent states that the system of the gaming service provider "may recommend games to the player based on personal information about the player (e.g., age, income, occupation, etc.), based on stated preferences of the player, based on games previously played by the player, or based on any other factor." '515 patent 11:11–18. Moreover, the '515 patent states that, "[i]f the player has played a first game, then the Website may recommend a second game that has a characteristic in common with the first game." '515 patent 11:62–12:13. As an example, the '515 patent specification notes that, "if the player has played a first five-reel slot machine game, then the Website may recommend a second five-reel slot machine game." '515 patent 11:62–12:13.

93.    The '515 patent also discloses that the mobile application can recommend a game having similar characteristics of a game that the user enjoys. The '515 patent states that, whether the player enjoys a game can be determined by whether the "player has played the first game for a lengthy period of time (e.g., for more than half an hour) or if the player has played the first game many times (e.g., more than twenty times)." '515 patent 11:62–12:13. Alternatively, "if a player has played a first game, the Website may recommend to the player games that have been played by other players who have also played the first game." '515 patent 12:14–37. The '515 patent also notes that "sophisticated algorithms" can be used to recommend games, such as a "neural network" that "may be trained to determine, in general, new games that any given player will like based on old games he has liked." '515 patent 12:38–45.

94.    These game-recommendation techniques were unconventional at the time of the '515 patent. Brick-and-mortar casinos did not face similar technological challenges—they had

well-established gaming setups and did not need to rely on recommending games to individuals. And mobile gambling was in its infancy at the time of the '515 patent, as discussed above. Users were unfamiliar with mobile-gaming applications, and gaming recommendations reduced the burden on individual users to discover games of interest. The '515 patent claims solve these technological challenges by, for example, "identifying a first game played by a user based on … an amount of time that the first game was played by the user" and "determining a second game that has a common characteristic with the first game." '515 patent claim 1. That determination is combined with identifying "a percentage increase in play of the second game by a plurality of people over a first period of time" to provide "a recommendation to play the second game to a mobile phone for display on the mobile phone." '515 patent claim 1. Moreover, the claimed techniques ensure that "the mobile phone is in a defined geographical area in which gambling is permitted" as part of providing the recommendation. *See* '515 patent claim 1.

## FANDUEL'S INFRINGING TECHNOLOGY AND CONDUCT

### A.    FanDuel's Mobile Apps

95.    On information and belief, FanDuel is a digital sports entertainment and gaming company.

96.    On information and belief, FanDuel was established in 2009 as a fantasy sports service company. Fantasy sports allow users to create and develop sports teams utilizing real-world athletes who score points during games.

97.    On information and belief, as of today, FanDuel operates a number of mobile applications[26] and web-based interfaces, including FanDuel Sportsbook & Casino, FanDuel

---

[26] *See, e.g.*, https://apps.apple.com/us/developer/fanduel-inc/id599664829 (Exhibit 31).

Casino, FanDuel Fantasy Sports, FanDuel Racing, and FanDuel Picks. FanDuel's Mobile Apps

can be downloaded and used on any iOS or Android device.[27]

 

---

[27] The five images below are screenshots of FanDuel's Mobile Apps as they appear on an iOS device.







98.     Further, FanDuel's Mobile Apps can be used through a web browser from a desktop, laptop, or other computer, as shown below.



*See* https://sportsbook.fanduel.com/[28] (last accessed July 14, 2025).

---

[28] *See* Exhibit 32.



*See* https://casino.fanduel.com/[29] (last accessed July 14, 2025).



*See* https://account.www.fanduel.com/login?external-referrer-next=contests/[30]
(last accessed October 31, 2025).

---

[29] *See* Exhibit 33.

[30] *See* Exhibit 34.



See https://racing.fanduel.com/[31] (last accessed July 14, 2025).



See https://www.fanduel.com/picks/[32] (last accessed October 31, 2025).

### 1.    FanDuel Sportsbook & Casino

99.    On information and belief, in 2018, FanDuel launched its first online sportsbook,

FanDuel Sportsbook & Casino, in the State of New Jersey. According to its website, FanDuel

---

[31] *See* Exhibit 35.

[32] *See* Exhibit 36.

describes its Sportsbook & Casino as "North America's go-to for sports betting as the most downloaded app and #1 online sportsbook."[33]

100.    The FanDuel Sportsbook & Casino application allows users to make bets on various sporting events. FanDuel notes that, "[i]n addition to Tennis Majors, UFC, PGA and major leagues like the NFL, MLB, EPL, NBA, and NHL, users can take advantage of our in-game betting offers, same game parlay plus features, and boosted event betting odds!"[34]

101.    As touted on the FanDuel Sportsbook & Casino website, "FanDuel Sportsbook is the best rated among all online betting sites in the United States. As long as you are physically located in an eligible state you are free to use the FanDuel Sportsbook & Casino for regulated sports betting online!"[35]

102.    Wagering options within the FanDuel Sportsbook application include:[36]

(a)    Spreads: "Choose the favorite or underdog and bet on the margin of victory or defeat."

(b)    Moneylines: "Pick winners outright and reap the rewards."

(c)    Teasers: "Combine multiple bets and get more favorable spreads for each."

(d)    Totals: "Choose the over under and bet on total number of points scored in a game."

---

[33] *See* https://www.fanduel.com/legal-sports-betting-us-map at 2 (Exhibit 37).

[34] *See* https://apps.apple.com/us/app/fanduel-sportsbook-casino/id1413721906 (Exhibit 38); *see also* https://play.google.com/store/apps/details?id=com.fanduel.sportsbook (Exhibit 39).

[35] *See* https://sportsbook.fanduel.com/ (Exhibit 32).

[36] *See id.*

(e)    Props: "Bet on more than just winning and losing, including player

performances, individual quarters, and more."

(f)    Live Bets: "Kickoff is just the beginning - place bets throughout the

game."

103.    FanDuel Sportsbook & Casino is available in a number of states, including New

Jersey.[37]



The legalization of sports gambling in America is advancing at different rates in different states. Is FanDuel available in your state for legal sports betting online, retail wagering at the sportsbook counter, or both? Here's a guide to the current status and availability of FanDuel in every U.S. state.



104.    As explained below and in the accompanying claim charts (Exhibits 6–10), on

information and belief, FanDuel's Mobile Apps, including at least the FanDuel Sportsbook &

Casino application, incorporate Interactive Games' innovative solutions for gambling and

practice all asserted claims of the Asserted Patents.

---

[37] *See* https://www.fanduel.com/legal-sports-betting-us-map (Exhibit 37).

46

### 2.    FanDuel Casino

105.    On information and belief, in 2020, FanDuel developed its online casino platform, FanDuel Casino. The product featured "some of the most popular and recognized table games and slots for customers to enjoy, including fan favorites like Blackjack, Roulette, and Video Poker, as well as incredible slots like Divine Fortune© and Wheel of Fortune™ Extreme Spin Edition."[38] FanDuel noted that the "dedicated online casino experience that is secure, legal, and fully regulated."[39]

106.    The FanDuel Casino application allows users to play a variety of games using real-world money similar to what one would find at a casino.[40] Exemplary games include slots, table games, blackjack, roulette, craps, video poker, and baccarat.[41] FanDuel's website touts that users can "[e]njoy a superior online gaming experience and play all your favorite casino games you would find on the casino floor – anywhere you have a signal!"[42]

107.    According to the FanDuel Casino website, you can "PLAY CASINO GAMES ANYWHERE IN PA, MI, NJ OR WV RIGHT FROM YOUR PHONE ON THE FANDUEL CASINO APP!"[43]

108.    Games on the FanDuel Casino application and website include:

(a)    Divine Fortune

---

[38] *See* https://www.businesswire.com/news/home/20200624005543/en/FanDuel-Group-Doubles-Down-With-Stand-Alone-Casino-App-in-Pennsylvania (Exhibit 40).

[39] *See id.*

[40] *See* https://apps.apple.com/us/app/fanduel-casino-real-money/id1506229470 (Exhibit 41); *see also* https://play.google.com/store/apps/details?id=com.fanduel.casino (Exhibit 42).

[41] *See* https://casino.fanduel.com/ (Exhibit 33).

[42] *See* https://apps.apple.com/us/app/fanduel-casino-real-money/id1506229470 (Exhibit 41); *see also* https://play.google.com/store/apps/details?id=com.fanduel.casino (Exhibit 42).

[43] *See id.*

(b)    Smokin' Triples

(c)    88 Fortunes

(d)    Wheel of Fortune

(e)    White Rabbit

(f)    Madman Monkey

(g)    Blackjack Classic

(h)    Zappit Blackjack

(i)    Multi-hand Blackjack

(j)    Blackjack Poker and Pairs

(k)    Casino War

(l)    Baccarat

(m)    Casino Hold 'Em Poker

(n)    Five Play Draw Poker

109.    Moreover, the FanDuel Casino application includes live casino games, like poker or roulette.

110.    The FanDuel Casino application is authorized in a handful of states, including New Jersey.[44]

---

[44] *See id.*

48

111.     As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, FanDuel's Mobile Apps, including at least the FanDuel Casino application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 3.     FanDuel Fantasy Sports

112.     On information and belief, FanDuel developed its online fantasy sports platform, FanDuel Fantasy Sports. According to the Apple App Store and the Google Play Store, FanDuel describes its Fantasy Sports application as including "daily and weekly contests you'll love" and as providing "[c]ash prizes."[45]

113.     The current version of the FanDuel Fantasy Sports application allows users to draft their own "fantasy" team from a variety of sports leagues, including the NFL, MLB,

---

[45] *See* https://apps.apple.com/us/app/fanduel-fantasy-sports/id599664106 (Exhibit 43); *see also* https://play.google.com/store/apps/details?id=com.fanduel.android.self (Exhibit 44).

NCAAF, NBA, PGA, NHL, UFC, and Soccer.[46] Users can then use these teams to place wagers and compete for monetary prizes.[47]

114.    In the FanDuel Fantasy Sports application, users can place bets on single games or with daily contests. Users can also play with friends or in public contests to try to win monetary prizes.

115.    Further, FanDuel Fantasy Sports is legal in most states, including New Jersey.[48]

US residents only. Users must be 18 or older (19 or older in AL, 21 or older in AZ, IA, LA, MA). Users physically located in DE, ID, HI, MT, NV, and WA are not eligible to participate in paid contests. FanDuel makes no representation that participation in paid entry fantasy sports contests is lawful under Texas state law. Additional state limitations may apply.

116.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, FanDuel's Mobile Apps, including at least the FanDuel Fantasy Sports application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 4.    FanDuel Racing

117.    On information and belief, in 2020, FanDuel launched its FanDuel Racing platform, which allows for wagering on races in over 300 tracks around the world.

118.    Some of the races include the Kentucky Derby, Preakness, Belmont, and Breeders' Cup.[49]

---

[46] *See* https://apps.apple.com/us/app/fanduel-fantasy-sports/id599664106 (Exhibit 43); *see also* https://play.google.com/store/apps/details?id=com.fanduel.android.self (Exhibit 44).

[47] *See id.*

[48] *See id.*

[49] *See* https://racing.fanduel.com/ (Exhibit 35).

119. Through the FanDuel Racing application, users can make various wagers for horses, including whether a horse comes first, whether a horse comes first or second, whether a horse comes in first, second, or third, and other similar wagers.[50]

120. The FanDuel Racing application is operable in many states, including New Jersey.[51]



121. As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, FanDuel's Mobile Apps, including at least the FanDuel Racing application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 5. FanDuel Picks

122. On information and belief, in April 2025, FanDuel launched its FanDuel Picks platform. According to the FanDuel Picks website, the application allows users to "join the

---

[50] *See* https://support.fanduel.com/s/article/Common-Wager-Types (Exhibit 45).

[51] *See* https://support.fanduel.com/s/article/State-Specific-Rule (Exhibit 46).

excitement of peer-to-peer fantasy sports by building lineups of your favorite athletes and predicting whether they'll beat their projected stats during real-world games."[52]

123.    In order to play, a user first picks 3–6 players. Then, the user predicts whether those players will exceed or fall short of their projected statistics for a particular game. From there, users place monetary wagers on their predictions.

124.    After the live game, users are then given scores based on whether they met their predictions, and winnings are distributed accordingly.

125.    The FanDuel Picks application is available in a number of states, as shown below.[53]



126.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, FanDuel's Mobile Apps, including at least the FanDuel Picks application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

---

[52] *See* https://www.fanduel.com/picks (Exhibit 36).

[53] *See id.*

### B.    FanDuel's Location Service and User Verification Requirements

127.    On information and belief, FanDuel's Mobile Apps include services for detecting the location of users and verifying those users.

128.    For example, FanDuel's Mobile Apps allow users to access FanDuel's system through either a mobile device or computer. FanDuel's Mobile Apps note that users can enjoy the applications "anywhere you have a signal!"[54] Further, the FanDuel Sportsbook & Casino application states that users can "try our casino games all within the FanDuel Sportsbook & Casino app."[55]

129.    FanDuel's Mobile Apps also determine whether the mobile device is authorized to use the application and the location of the user via geolocation detection software.

130.    According to FanDuel, to use "the Fan[D]uel Sportsbook app, it will need to access your Location Services information, you'll get a notification asking for permission."[56] On information and belief, FanDuel's software in FanDuel's Mobile Apps embeds location-verifying routines provided by third-party GeoComply Solutions Inc. (GeoComply).[57] These routines are included in FanDuel's Mobile Apps that are installed on users' devices and are responsible for determining and verifying that users are permitted to gamble.

131.    On information and belief, FanDuel puts GeoComply's system into service such that FanDuel controls the system and obtains a benefit from it. In particular, FanDuel wrote its

---

[54] *See* https://apps.apple.com/us/app/fanduel-casino-real-money/id1506229470 (Exhibit 41); *see also* https://play.google.com/store/apps/details?id=com.fanduel.casino (Exhibit 42).

[55] *See* https://apps.apple.com/us/app/fanduel-sportsbook-casino/id1413721906 (Exhibit 38); *see also* https://play.google.com/store/apps/details?id=com.fanduel.sportsbook (Exhibit 39).

[56] *See* https://support.fanduel.com/s/article/How-do-I-enable-location-services-for-my-Apple-iOS-app-sportsbook (Exhibit 47).

[57] *See id.*; *see also* https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/ (Exhibit 48).

software specifically to leverage GeoComply's system, intending and expecting for the system to return users' locations. On information and belief, moreover, FanDuel exerts direction and control over GeoComply and its system such that FanDuel controls the performance of the GeoComply system and directly benefits from such performance. In particular, on information and belief, FanDuel contracts with GeoComply for GeoComply to perform geolocation services for FanDuel's Mobile Apps. FanDuel obtains benefits, including profits, from the use of GeoComply systems since its applications could not legally operate without geolocation services.

132.    According to GeoComply, its system can "pinpoint[] a customer's location to within meters, to accurately determine if they're in a sanctioned country or a restricted jurisdiction."[58]

133.    In addition, GeoComply can further validate a user's mobile device, including by running "hundreds of location data, device integrity, and identity fraud checks on every geolocation transaction to detect suspicious activity."[59]

134.    On information and belief, GeoComply repeatedly checks the location of users. For example, GeoComply notes that its system "[p]rotects against fraudulent activities associated with users such as location jumping, proxy betting, account sharing and account takeover."[60] Further, GeoComply notes that "[o]ur rules engine runs hundreds of location data, device integrity, and identity fraud checks on every geolocation transaction to detect suspicious

---

[58] *See* https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/ at 3 (Exhibit 48).

[59] *See id.* at 5.

[60] *See id.* at 11.

activity."[61] Moreover, GeoComply informed state legislatures that users are "rechecked more often as [they] approach the [state] border."[62]

135.    On information and belief, FanDuel's Mobile Apps will not work if a player is outside a permitted jurisdiction or if the location of the mobile device is blocked. For example, FanDuel provides troubleshooting tips to users who receive an error message indicating that their location is blocked.[63] Further, FanDuel advises that, "[i]f you're close to a state or province boundary, your device might be connecting to a cell tower or Wi-Fi hotspot where FanDuel isn't allowed. It can help to physically travel farther in-state so your device can accurately locate you."[64]

136.    On information and belief, FanDuel's Mobile Apps will cease working if the player moves outside a jurisdiction in which gambling is legal. For example, FanDuel notes that "[y]ou will not be able to use wagering services or place bets with us without location data being turned on."[65]

137.    In addition, FanDuel's Mobile Apps require user verification. For example, FanDuel's Terms and Conditions state that, "[b]y registering for an account and/or using the Service, you agree to provide us with a valid name, date of birth, and social security number (or the last four digits thereof), residential address, email address, phone number, and any other

---

[61] *See id.* at 15.

[62] https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2015_0059T.pdf at 98:23–99:4 (Exhibit 49).

[63] *See* https://support.fanduel.com/s/article/Location-Troubleshooting-Tips (Exhibit 50).

[64] *See id.* at 3.

[65] *See* https://www.fanduel.com/fanduel-sportsbook-privacy-policy at 4 (Exhibit 51).

information we may require in order to run appropriate identity checks and comply with applicable rules and regulations."[66]

### 4.5 Deposits and Withdrawals Generally

By registering for an account and/or using the Service, you agree to provide us with a valid name, date of birth, and social security number(or the last four digits thereof), residential address, email address, phone number, and any other information we may require in order to run appropriate identity checks and comply with applicable rules and regulations. If necessary, you may be required to provide appropriate documentation that allows us to verify you.

### C.      FanDuel's Harm to Interactive Games

138.    FanDuel places FanDuel's Mobile Apps into the stream of commerce by providing, using, and testing its gaming products and services. On information and belief, FanDuel controls its gaming application platforms and benefits from its sole control, including dictating the use of any third-party software.

139.    FanDuel has substantially profited from the infringing use of Interactive Games' technology. For example, it was reported that FanDuel generated $5.79 billion in revenue in 2024.[67] It was further reported that FanDuel's Mobile Apps were downloaded 10.8 million times in 2024, with the majority of players downloading FanDuel's "Sportsbook & Casino app."[68]

140.    FanDuel's infringement causes irreparable harm to Interactive Games such that a permanent injunction is appropriate. *See* Statement of Interest of the United States of America, *Radian Memory Sys. LLC v. Samsung Elec. Co., Ltd.*, No. 2:24-cv-01073 (E.D. Tex. June 24, 2025), ECF No. 52. For example, FanDuel's use of Interactive Games' technology causes Interactive Games harm in the marketplace by infringing its patents and interfering with potential license arrangements, among other harms. Moreover, in the absence of an injunction, other companies would be encouraged to infringe Interactive Games' patents as well.

---

[66] *See* https://www.fanduel.com/terms at 1 (Exhibit 52).

[67] *See* https://www.businessofapps.com/data/fanduel-statistics/ at 2 (Exhibit 53).

[68] *See id.* at 3.

D.      **FanDuel's Knowledge of Interactive Games' Patent Portfolio**

141.    In 2014, Cantor Fitzgerald L.P. sent a letter to FanDuel notifying it of the patent assets owned by Cantor Fitzgerald L.P. and its affiliates (including Interactive Games).[69] In the letter, Cantor Fitzgerald L.P. explained that its patent assets include a portfolio relating to fantasy sports, fantasy sports websites, and fantasy sports-related services, applications, and platforms. The letter also invited FanDuel to license the portfolio. To help facilitate licensing discussions, the letter cited patents that FanDuel was infringing at the time and additionally cited pending patent applications.

142.    On information and belief, FanDuel is aware of Interactive Games' innovation in this space, monitors Interactive Games' patent portfolio, and is aware of any new patents that issue.

143.    Additionally, on April 1, 2026—before filing this lawsuit—Interactive Games sent a notice letter to FanDuel informing it of the Asserted Patents and explaining why and how FanDuel's Mobile Apps infringe each patent in nearly 275 pages of detailed infringement claim charts.[70]

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 12,420,181

144.    Interactive Games realleges and incorporates by reference paragraphs 1 through 143 as if fully set forth herein.

145.    At all times herein mentioned, the '181 patent has been and is valid and fully enforceable.

---

[69] *See* Exhibit 54.

[70] *See* Exhibit 55.

57

146.     By making, using, selling, and offering to sell in the United States, and importing into the United States, FanDuel's Mobile Apps and services, FanDuel directly infringes certain claims of the '181 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, FanDuel tests the Mobile Apps in a manner that directly infringes the '181 patent. As an example, FanDuel has infringed and continues to infringe at least claims 1–30 of the '181 patent as illustrated in the claim chart attached as **Exhibit 6**.

147.     At no time has Interactive Games granted FanDuel authorization, license, or permission to utilize the inventions claimed in the '181 patent.

148.     On information and belief, FanDuel has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to FanDuel's business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

149.     Additionally, on April 1, 2026, Interactive Games sent FanDuel a letter notifying it of the '181 patent and explaining why and how FanDuel's Mobile Apps infringe the '181 patent.[71] Thus, on information and belief, FanDuel was aware of the '181 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

150.     FanDuel, with knowledge of the '181 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of FanDuel's Mobile Apps, to infringe the '181 patent. These actions include:

---

[71] *See* Exhibit 54.

- encouraging users to download or use FanDuel's Mobile Apps on their mobile devices through marketing.

- providing support for its users to use FanDuel's Mobile Apps through its websites and mobile applications, including through help pages and an online "Live Chat" service. *See, e.g.*, https://support.fanduel.com/s/ (Exhibit 56).

- providing instructions to its users on how to use FanDuel's Mobile Apps, including through video guides and webpages, such as the "FanDuel Casino 101: Getting Started" Guide. *See, e.g.*, https://www.fanduel.com/casino-101/getting-started (Exhibit 57).

- requiring users to activate and use geolocation services prior to using FanDuel's Mobile Apps. *See, e.g.*, https://support.fanduel.com/s/article/Location-Troubleshooting-Tips (Exhibit 58); https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin (Exhibit 59).

- placing FanDuel's Mobile Apps on both the Apple App Store and Google Play Store for users to download.

151. FanDuel has been aware of the '181 patent and has knowingly continued to infringe the '181 patent, such that the infringement is willful. On information and belief, FanDuel will continue to willfully infringe the '181 patent.

152. Interactive Games will suffer irreparable harm unless FanDuel is enjoined from infringing the '181 patent.

153. As a result of FanDuel's infringement of the '181 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for FanDuel's infringing acts as provided by 35 U.S.C. § 284.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 12,397,226

154. Interactive Games realleges and incorporates by reference paragraphs 1 through 153 as if fully set forth herein.

155. At all times herein mentioned, the '226 patent has been and is valid and fully enforceable.

156.    By making, using, selling, and offering to sell in the United States, and importing into the United States, FanDuel's Mobile Apps and services, FanDuel directly infringes certain claims of the '226 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, FanDuel tests the Mobile Apps in a manner that directly infringes the '226 patent. As an example, FanDuel has infringed and continues to infringe at least claims 1–3, 5–8, 12–21, and 25 of the '226 patent as illustrated in the claim chart attached as **Exhibit 7**.

157.    At no time has Interactive Games granted FanDuel authorization, license, or permission to utilize the inventions claimed in the '226 patent.

158.    On information and belief, FanDuel has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to FanDuel's business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

159.    Additionally, on April 1, 2026, Interactive Games sent FanDuel a letter notifying it of the '226 patent and explaining why and how FanDuel's Mobile Apps infringe the '226 patent.[72] Thus, on information and belief, FanDuel was aware of the '226 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

160.    FanDuel, with knowledge of the '226 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of FanDuel's Mobile Apps, to infringe the '226 patent. These actions include:

---

[72] *See* Exhibit 54.

- encouraging users to download or use FanDuel's Mobile Apps on their mobile devices through marketing.

- providing support for its users to use FanDuel's Mobile Apps through its websites and mobile applications, including through help pages and an online "Live Chat" service. *See, e.g.*, https://support.fanduel.com/s/ (Exhibit 56).

- providing instructions to its users on how to use FanDuel's Mobile Apps, including through video guides and webpages, such as the "FanDuel Casino 101: Getting Started" Guide. *See, e.g.*, https://www.fanduel.com/casino-101/getting-started (Exhibit 57).

- requiring users to activate and use geolocation services prior to using FanDuel's Mobile Apps. *See, e.g.*, https://support.fanduel.com/s/article/Location-Troubleshooting-Tips (Exhibit 58); https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin (Exhibit 59).

- placing FanDuel's Mobile Apps on both the Apple App Store and Google Play Store for users to download.

161. FanDuel has been aware of the '226 patent and has knowingly continued to infringe the '226 patent, such that the infringement is willful. On information and belief, FanDuel will continue to willfully infringe the '226 patent.

162. Interactive Games will suffer irreparable harm unless FanDuel is enjoined from infringing the '226 patent.

163. As a result of FanDuel's infringement of the '226 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for FanDuel's infringing acts as provided by 35 U.S.C. § 284.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,974,302

164. Interactive Games realleges and incorporates by reference paragraphs 1 through 163 as if fully set forth herein.

165. At all times herein mentioned, the '302 patent has been and is valid and fully enforceable.

166.    By making, using, selling, and offering to sell in the United States, and importing into the United States, FanDuel's Mobile Apps and services, FanDuel directly infringes certain claims of the '302 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, FanDuel tests the Mobile Apps in a manner that directly infringes the '302 patent. As an example, FanDuel has infringed and continues to infringe at least claims 1–17, 19–24, 26, 28–40 of the '302 patent as illustrated in the claim chart attached as **Exhibit 8**.

167.    At no time has Interactive Games granted FanDuel authorization, license, or permission to utilize the inventions claimed in the '302 patent.

168.    On information and belief, FanDuel has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to FanDuel's business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

169.    Additionally, on April 1, 2026, Interactive Games sent FanDuel a letter notifying it of the '302 patent and explaining why and how FanDuel's Mobile Apps infringe the '302 patent.[73] Thus, on information and belief, FanDuel was aware of the '302 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

170.    FanDuel, with knowledge of the '302 patent, has engaged in an extensive pattern of conduct intended to induce others, including users of FanDuel's Mobile Apps, to infringe the '302 patent. These actions include:

---

[73] *See* Exhibit 54.

- encouraging users to download or use FanDuel's Mobile Apps on their mobile devices through marketing.

- providing support for its users to use FanDuel's Mobile Apps through its websites and mobile applications, including through help pages and an online "Live Chat" service. *See, e.g.*, https://support.fanduel.com/s/ (Exhibit 56).

- providing instructions to its users on how to use FanDuel's Mobile Apps, including through video guides and webpages, such as the "FanDuel Casino 101: Getting Started" Guide. *See, e.g.*, https://www.fanduel.com/casino-101/getting-started (Exhibit 57).

- requiring users to activate and use geolocation services prior to using FanDuel's Mobile Apps. *See, e.g.*, https://support.fanduel.com/s/article/Location-Troubleshooting-Tips (Exhibit 58); https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin (Exhibit 59).

- placing FanDuel's Mobile Apps on both the Apple App Store and Google Play Store for users to download.

171. FanDuel has been aware of the '302 patent and has knowingly continued to infringe the '302 patent, such that the infringement is willful. On information and belief, FanDuel will continue to willfully infringe the '302 patent.

172. Interactive Games will suffer irreparable harm unless FanDuel is enjoined from infringing the '302 patent.

173. As a result of FanDuel's infringement of the '302 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for FanDuel's infringing acts as provided by 35 U.S.C. § 284.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 12,434,138**

174. Interactive Games realleges and incorporates by reference paragraphs 1 through 173 as if fully set forth herein.

175. At all times herein mentioned, the '138 patent has been and is valid and fully enforceable.

176.    By making, using, selling, and offering to sell in the United States, and importing into the United States, FanDuel's Mobile Apps and services, FanDuel directly infringes certain claims of the '138 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, FanDuel tests the Mobile Apps in a manner that directly infringes the '138 patent. As an example, FanDuel has infringed and continues to infringe at least claims 1–30 of the '138 patent as illustrated in the claim chart attached as **Exhibit 9**.

177.    At no time has Interactive Games granted FanDuel authorization, license, or permission to utilize the inventions claimed in the '138 patent.

178.    On information and belief, FanDuel has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to FanDuel's business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

179.    Additionally, on April 1, 2026, Interactive Games sent FanDuel a letter notifying it of the '138 patent and explaining why and how FanDuel's Mobile Apps infringe the '138 patent.[74] Thus, on information and belief, FanDuel was aware of the '138 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

180.    FanDuel, with knowledge of the '138 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of FanDuel's Mobile Apps, to infringe the '138 patent. These actions include:

---

[74] *See* Exhibit 54.

- encouraging users to download or use FanDuel's Mobile Apps on their mobile devices through marketing.

- providing support for its users to use FanDuel's Mobile Apps through its websites and mobile applications, including through help pages and an online "Live Chat" service. *See, e.g.*, https://support.fanduel.com/s/ (Exhibit 56).

- providing instructions to its users on how to use FanDuel's Mobile Apps, including through video guides and webpages, such as the "FanDuel Casino 101: Getting Started" Guide. *See, e.g.*, https://www.fanduel.com/casino-101/getting-started (Exhibit 57).

- requiring users to activate and use geolocation services prior to using FanDuel's Mobile Apps. *See, e.g.*, https://support.fanduel.com/s/article/Location-Troubleshooting-Tips (Exhibit 58); https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin (Exhibit 59).

- placing FanDuel's Mobile Apps on both the Apple App Store and Google Play Store for users to download.

181. FanDuel has been aware of the '138 patent and has knowingly continued to infringe the '138 patent, such that the infringement is willful. On information and belief, FanDuel will continue to willfully infringe the '138 patent.

182. Interactive Games will suffer irreparable harm unless FanDuel is enjoined from infringing the '138 patent.

183. As a result of FanDuel's infringement of the '138 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for FanDuel's infringing acts as provided by 35 U.S.C. § 284.

## **COUNT V: INFRINGEMENT OF U.S. PATENT NO. 12,400,515**

184. Interactive Games realleges and incorporates by reference paragraphs 1 through 183 as if fully set forth herein.

185. At all times herein mentioned, the '515 patent has been and is valid and fully enforceable.

65

186.    By making, using, selling, and offering to sell in the United States, and importing into the United States, FanDuel's Mobile Apps and services, FanDuel directly infringes certain claims of the '515 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, FanDuel tests the Mobile Apps in a manner that directly infringes the '515 patent. As an example, FanDuel has infringed and continues to infringe at least claims 5–7, 13–15, 17–22, and 24–29 of the '515 patent as illustrated in the claim chart attached as **Exhibit 10**.

187.    At no time has Interactive Games granted FanDuel authorization, license, or permission to utilize the inventions claimed in the '515 patent.

188.    On information and belief, FanDuel has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to FanDuel's business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

189.    Additionally, on April 1, 2026, Interactive Games sent FanDuel a letter notifying it of the '515 patent and explaining why and how FanDuel's Mobile Apps infringe the '515 patent.[75] Thus, on information and belief, FanDuel was aware of the '515 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

190.    FanDuel, with knowledge of the '515 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of FanDuel's Mobile Apps, to infringe the '515 patent. These actions include:

---

[75] *See* Exhibit 54.

- encouraging users to download or use FanDuel's Mobile Apps on their mobile devices through marketing.

- providing support for its users to use FanDuel's Mobile Apps through its websites and mobile applications, including through help pages and an online "Live Chat" service. *See, e.g.*, https://support.fanduel.com/s/ (Exhibit 56).

- providing instructions to its users on how to use FanDuel's Mobile Apps, including through video guides and webpages, such as the "FanDuel Casino 101: Getting Started" Guide. *See, e.g.*, https://www.fanduel.com/casino-101/getting-started (Exhibit 57).

- requiring users to activate and use geolocation services prior to using FanDuel's Mobile Apps. *See, e.g.*, https://support.fanduel.com/s/article/Location-Troubleshooting-Tips (Exhibit 58); https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin (Exhibit 59).

- placing FanDuel's Mobile Apps on both the Apple App Store and Google Play Store for users to download.

191. FanDuel has been aware of the '515 patent and has knowingly continued to infringe the '515 patent, such that the infringement is willful. On information and belief, FanDuel will continue to willfully infringe the '515 patent.

192. Interactive Games will suffer irreparable harm unless FanDuel is enjoined from infringing the '515 patent.

193. As a result of FanDuel's infringement of the '515 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for FanDuel's infringing acts as provided by 35 U.S.C. § 284.

## **PRAYER FOR RELIEF**

WHEREFORE, Interactive Games respectfully requests that the Court enter judgment in its favor and enter an order:

1. Finding that FanDuel directly infringes the asserted claims of the Asserted Patents—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271;

2.   Finding that FanDuel's infringement is willful;

3.   Enjoining FanDuel, its officers, directors, agents, servants, affiliates, employees, subsidiaries, divisions, branches, parents, attorneys, representatives, privies, and all others acting in concert or participation with any of them, from infringing the Asserted Patents directly or indirectly in violation of 35 U.S.C. § 271;

4.   Awarding Interactive Games damages adequate to compensate for FanDuel's infringement, but in no event less than a reasonable royalty for FanDuel's infringing acts as provided by 35 U.S.C. § 284;

5.   Awarding Interactive Games increased damages, as appropriate under 35 U.S.C. § 284;

6.   Awarding Interactive Games pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

7.   Declaring this to be an exceptional case pursuant to 35 U.S.C. § 285 and awarding Interactive Games its attorneys' fees;

8.   Awarding Interactive Games its costs; and

9.   Granting Interactive Games such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Interactive Games requests a trial by jury on all issues so triable by right.


Dated: April 2, 2026                                    Respectfully submitted,

                                                        /s/ Liza M. Walsh
                                                        Liza M. Walsh
                                                        Christine I. Gannon
                                                        Jessica K. Formichella

68

**WALSH PIZZI O'REILLY**
   **FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100
lwalsh@walsh.law
cgannon@walsh.law
formichella@walsh.law

Michael Joffre (DCB# 497813)
(*pro hac vice* forthcoming)
Chandrika Vira (DCB# 1018150)
(*pro hac vice* forthcoming)
Daniel Block (DCB# 1009049)
(*pro hac vice* forthcoming)
William H. Milliken (DCB# 1032206)
(*pro hac vice* forthcoming)
Richard A. Crudo (DCB# 1015732)
(*pro hac vice* forthcoming)
**STERNE, KESSLER, GOLDSTEIN &**
   **FOX P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
mjoffre@sternekessler.com
cvira@sternekessler.com
dblock@sternekessler.com
wmilliken@sternekessler.com
rcrudo@sternekessler.com

*Attorneys for Plaintiff*
*Interactive Games LLC*

69

## LOCAL RULE 11.2 CERTIFICATION

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other pending litigation in any court, administrative proceeding, or arbitration proceeding, nor are there any non-parties known to Interactive Games that should be joined to this action.

Dated: April 2, 2026

/s/ Liza M. Walsh
Liza M. Walsh
Christine I. Gannon
Jessica K. Formichella
**WALSH PIZZI O'REILLY
    FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100
lwalsh@walsh.law
cgannon@walsh.law
formichella@walsh.law

Michael Joffre (DCB# 497813)
(*pro hac vice* forthcoming)
Chandrika Vira (DCB# 1018150)
(*pro hac vice* forthcoming)
Daniel Block (DCB# 1009049)
(*pro hac vice* forthcoming)
William H. Milliken (DCB# 1032206)
(*pro hac vice* forthcoming)
Richard A. Crudo (DCB# 1015732)
(*pro hac vice* forthcoming)
**STERNE, KESSLER, GOLDSTEIN &
    FOX P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
mjoffre@sternekessler.com
cvira@sternekessler.com
dblock@sternekessler.com
wmilliken@sternekessler.com
rcrudo@sternekessler.com

*Attorneys for Plaintiff*
*Interactive Games LLC*

70

## <u>LOCAL RULE 201.1 CERTIFICATION</u>

I hereby certify that the above-captioned matter is not subject to compulsory arbitration in that Interactive Games seeks, *inter alia*, injunctive relief.

Dated: April 2, 2026

*/s/ Liza M. Walsh*

Liza M. Walsh
Christine I. Gannon
Jessica K. Formichella
**WALSH PIZZI O'REILLY
    FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
(973) 757-1100
lwalsh@walsh.law
cgannon@walsh.law
formichella@walsh.law

Michael Joffre (DCB# 497813)
(*pro hac vice* forthcoming)
Chandrika Vira (DCB# 1018150)
(*pro hac vice* forthcoming)
Daniel Block (DCB# 1009049)
(*pro hac vice* forthcoming)
William H. Milliken (DCB# 1032206)
(*pro hac vice* forthcoming)
Richard A. Crudo (DCB# 1015732)
(*pro hac vice* forthcoming)
**STERNE, KESSLER, GOLDSTEIN &
    FOX P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
mjoffre@sternekessler.com
cvira@sternekessler.com
dblock@sternekessler.com
wmilliken@sternekessler.com
rcrudo@sternekessler.com

*Attorneys for Plaintiff*
*Interactive Games LLC*

71